0550771 and the other numbers United States v. Shpirt, Grayboor Medical, and Gonzales. Before we get started on Shpirt, let me just ask appellant's counsel if they've figured out how they're going to allocate the time. We're very even-minded, Your Honor. We're going to divide it evenly if that's agreeable with the court. Sure. Just keep an eye on the clock, would you please? I'm sorry, Your Honor? If you keep an eye on the clock, we'd appreciate it if you're going to divide up your time equally. Oh, it's not going to be divided individually. I should just watch that for the global matter? You guys get a total of 20 minutes, and you can spend it however you like. Thank you, Your Honor. I'll try to use my math skills. Okay. May it please the Court, Donald Ray representing appellant Boris Shpirt. Your Honors, I would like to start with a discussion of the issue concerning multiple transports, which are the charges in counts 5 through 11, substantively, and it is also incorporated into the conspiracy charge. The multiple transport issue has to do with the fact that the counts, 5 through 11, reflect the transfer of four patients on one day and three patients on another day in the same The issue that comes up arises because at the time of the return of the indictment, the government referred to, and in fact it's incorporated in the indictment in paragraph 11, a federal regulation which indicated that if there were multiple patients being transported, there had to be a proration of the transports, which was different from the Medi-Cal regulation which the defendant said he was following, which allowed these kinds of transports under other conditions. The problem that arose was that the indictment referred to this, the government referred to this regulation, but it became clear during the course of trial that that regulation was not adopted until They offered to strike it. They did offer to strike it. And you declined. And the problem with that is that once that indictment had been returned by the grand jury, it's not the defendant's job to change an indictment, it's not the government's job to change an indictment, it's the grand jury's job to change the indictment. And so what had happened here was the government went to the grand jury and got a slam dunk indictment because these charges were not prorated, the regulation required proration. What they did then in the middle of trial is rather than try to prove that this was a violation of regulation, which is like a violation of law, they switched to basically this being a violation of some sort of insurance company policy. Now the effect of that, with regard to those substantive counts, is that it's not just a change in theory, it's actually a change in charge. And we cited the various cases which talk about a constructive amendment of the indictment, and that's effectively what occurred here. And by looking at it from the perspective of what was presented to the grand jury to allow them to return a conviction on these charges, it's very clear they're two completely different offenses. So that from our perspective, once you get into the position of having a constructive amendment of the indictment, which this clearly satisfied, there's no question of prejudice or anything along those lines. Now what the government says in response is that it's not a constructive amendment because it did not involve the term a complex of facts, which is the phraseology used in the cases to distinguish a constructive amendment from a variance. Well this is a different complex of facts. One set of facts had to do with, as I say, a slam dunk case. The regulation requires you to prorate, there was no proration. This set of facts had to do with nothing with regard to that. It had to do with a violation of some insurance company policy and who was aware of it and how that was communicated. So respectfully, the government's wrong on that. But even if it came down to an issue of variance, which is what the government tries to argue, they acknowledge that the error here was an error of law, and we have cited a series of cases, including Griffin and Barona, which talk about the fact that if the pettit jury was permitted to adopt a theory of prosecution which was legally incorrect as opposed to factually incorrect, that it is a fatal variance, which still requires reversal. And then the next level of review below that has to do with, assuming the fact that it's only a factual variance, which this was not, it was a legal variance, was the defendant prejudiced. And it's difficult to imagine that the defendant could not have been prejudiced because here you have a defendant who's defending a case based upon one theory of a statutory regulation which doesn't exist to having to defend an issue concerning notification and procedures which are occurring within an insurance company. So whichever level of review is used, it's clear that there is reversible error here. But respectfully, I think in this case, it is very clear that this is a constructive amendment of the indictment. You don't even have to get to the issue of prejudice. What I'd like to make about the substantive aspect of this argument is the defendants were not actually charged with violating that regulation. It seemed to be sort of in the preamble to the charges. The actual charge was the violation of 18 U.S.C. Section 1347. And that's what they were found guilty of. I agree with that. But the problem with that is that if one looks at what the evidence was presented before the grand jury, because the grand jury had to have gotten evidence of this regulation because they included it in the preamble, and you say how did the grand jury return an indictment on this case, there's no doubt that the grand jury returned an indictment on the case because there was a regulation which required proration which didn't occur on these billings. So when you ask what is it that this charge was based on in front of the grand jury, the very fact that the grand jury had an indictment, had returned an indictment which referred to this regulation which made these counts 5 through 11 absolutely violations of the law, it's clear that you, even though it's not incorporated by reference, it's part of the evidentiary basis upon which the grand jury returned an indictment. But there's a second part of this, because the prejudice flows not only from the substantive to the conspiracy count, but in vice versa. What really should have happened here, respectfully, is that the district court judge should have dismissed this conspiracy count, or at the very least, if it was not going to dismiss the entire count, should have instructed the jury that the Pinkerton instruction did not apply to counts 5 through 11, because what you have here is a problem in which there is an invalid conspiracy count. It does specifically include the allegation regarding the regulation as a basis for there being a problem with these multiple transports. Now, we have multiple objects of the conspiracy, which is now the government's favorite tactic, but that object of the conspiracy with regard to multiple transports was legally invalid. What happens then is the – it's a nonexistent charge. Under Pinkerton, the jury was permitted to find the defendant's guilty of that conspiracy and with regard to counts 5 through 11 of the conspiracy relating to the regulation and then use that to shoehorn in the counts 5 through 11. That's what gets us into the Barona and Griffin argument, because there was no legally justifiable basis for finding the object of the conspiracy relating to the multiple transports, because that part of the indictment was void. It wasn't misrepresenting how many people were transported in the ambulance for that trip. It's not a question of misrepresenting the number. In other words, what happened is … They were submitting the bill for each one individually when they were transported together. Well, what the defendant testified to and what the facts are, for example, under Medi-Cal, if you pick them up at different locations and drop them off at different locations, you're permitted to bill even though they're all carried by the same ambulance for portions of that trip. That's not what was happening here. That is what was happening here. According to the evidence. No. The evidence is fairly clear that even the EMTs are testifying that these people were picked up at different locations and dropped off at the same location or picked up at the same location and dropped off at different locations. That would have been a proper billing apparently under Medi-Cal. There is no false statement in terms of whether these people were carried. The only claim of a false statement is that there was no disclosure that there were more than one person in the ambulance so that there was no proration. The question then becomes why would you have to prorate? And there is no requirement that you prorate by regulation at the time that this happened. What the government fell back on is the claim that the only reason you have to prorate is that the insurance company had a policy which required you to prorate. But the regulation which required proration didn't come in for another two years. And that only was discovered apparently during the course of the trial. So I think that had this been discovered before trial, the government could have gone out and superseded the indictment. They were kind of in a pickle. I understand that. But that doesn't mean that you can violate the defendant's rights with regard to having him found guilty potentially under a conspiracy object which was legally void. There was one other aspect of that though. Didn't the court find that Defendant Sherp was on notice that he was to prorate He was on notice of the Transamerica's policy that is required to prorate. There was evidence which if believed by the jury could support that contention. The problem is when we get to a situation in which the jury's decision, which we don't know how it was based, the jury's decision could have either been based upon believing that evidence or it could have been based upon the notion that the defendants were guilty of the conspiracy and under Pinkerton they could find them The problem is if they took that second route, then we're in the Barona situation because they legally could not conclude that they were guilty of the conspiracy at least with regard to the object of the prorating of the trips. That's why I think there's a problem whether you go by looking at it at the substantive counts affecting the conspiracy or the conspiracy count affecting the substantive count. I think you get to the same point. We're going to hear from Mr. Graybore, not Mr. Graybore, but the Graybore counsel. Thank you. Thank you, Mr. Ray. May it please the Court. Gilbert Tamazian for Graybore Medical Transportation. Thank you, Your Honors. I previously filed a joinder in Boris Spitz, defendant Boris Spitz's appellate case. I have a brief appeal issues and I would join in counsel's argument. I have nothing for you to add at this time. I would reserve for rebuttal. If there are no questions, then Mr. Gonzales is there. Good morning. Good morning, Your Honors. Brian Newman on behalf of Daniel Gonzales. Your Honor, there are two issues that I wanted to address and one is the first one being the discovery issue and the potential Brady violation. In this particular case, Your Honor, my client post-trial went out and discovered additional evidence that had not been disclosed in two different locations, one being in Santa Ana, in a depository in Santa Ana, and the other actually being at the Graybore facility of some documents that were left over. And the document, it's funny because it's only one document, but it seems to carry the greatest weight was this travel slip from Dr. Runyon's office, I'm sorry, Rundle's office, where that was date stamped by a fax machine that established that one that the doctor was ordering ambulance transportation for certain patients and also that this, of course, predated what Mr. Gonzales was working at as a dispatcher for Graybore. Mr. Gonzales, of course, I consider him the baby of this group. He was working essentially as a lower-wage employee. He did not receive anything, any benefits from the fraud. He never had any say as to the fraud. And that sort of goes into my other argument having to do with sentencing and certainly that the sentencing certainly overstates his criminal culpability in this case. May I ask you, where were the boxes stored? Before, during the pretrial phase, where were the boxes located? Well, Your Honor, that's a good question. Evidently, the government had sent certain letters out that the, and I should say I was not trial counsel, that they were at the 300 building in Los Angeles, the federal building, and were being stored there. But evidently, because of the nature of the collection of the evidence and execution of the search warrants, evidently there were many, many boxes were sort of dispersed and diffused. Were those boxes wherever they were examined by defense counsel? Some boxes were, evidently, were obtained and... I guess what I'm getting at, if counsel doesn't look at the boxes they know about, why should we be concerned that they didn't look at the boxes they didn't know about? Well, that certainly goes to another issue that probably would be addressed at another time in another case. But, yeah, that is certainly a concern. But certainly Mr. Gonzales was actively involved in his defense. And as I said, he actually went out to the depository in San Anna post-trial, unfortunately, and discovered a lot more evidence. I think that Mr. Gonzales also was unfortunate that he didn't really realize the extent to which his trial counsel had not reviewed the discovery until he actually saw a copy of the trial counsel's billing, which indicated that he had reviewed so many boxes, but that there were so many boxes left over that had been reviewed and he couldn't have been reviewed. But the district court looked at this evidence, and didn't the district court conclude that it would not have affected the trial? Well, I understand that, Your Honor, but I believe that the district court was in error in doing that, because certainly one of the issues is this travel slip from Dr. Rundle, which had a date stamp on it. And certainly that was one of the, actually one of the travel slips that my client was accused of actually writing out. So certainly had that, even that one piece of document been brought before the jury with a date stamp on it that actually came from Dr. Rundle's office, may have made all the difference in the world for someone like Mr. Gonzales, who, as I said, was a dispatcher for, I think, seven months during the course of this situation, and was making about $600 a week. I'm not sure I follow you. Okay, so this one slip might have proven that he didn't do that particular run. There were plenty of other slips that he did do. But there was also that was found in speaking with one of Dr. Rundle's assistants or nurses post-trial that there were other binders of Dr. Rundle's that had been taken. And none of those were, or I shouldn't say none of them, but most of those were never disclosed to the defense. And they did not have the opportunity to go through those. And I think had they had the opportunity to go through those, particularly with the patients that were in. You're telling us that you still haven't been through some of this evidence? No, no. We have, but we have not found all of them. All the binders that Dr. Rundle, his office staff said that were taken, to this date, Your Honor, there are still one or two that we have not been able to locate. And one of the reasons for that, Your Honor, is that the record keeping on the part of the seizing agents was so sloppy that it was almost impossible to find out what was where and when and how it was picked up and where it was picked up. But that information was brought out by an employee of Dr. Rundle's that these journals, or binders as they were called, were actually disclosed. Secondly, Your Honor, as I said, I'd like to address the issue of the sentencing of Mr. Gonzales. And I think that the district court erred in placing a higher emphasis on one or two factors of the 3553 elements, and that is the seriousness of the offense. And I can't quantify the seriousness of the offense, but only to Mr. Gonzales' participation in the offense. And that is his offense was extremely limited, seven months, and he didn't benefit financially from it other than being paid as an employee of Graybar. Your Honor, at this point, I would like to join the arguments of my counsel, and I see I have about two minutes, a little over two minutes to hold and reserve, if I may. Thank you very much. Good morning. May I proceed? Good morning. May it please the Court, Peggy and Ryan for the United States. I would like to start by addressing some of the questions raised by Judge Wardlaw earlier. First, with respect to whether or not Defendant Spiert and Graybar and other co-defendants were placed on notice as to the requirement of notifying the number of patients who were in the van, excuse me, within the ambulance, they were placed on notice. Kathy Montoya, who works for Transamerica, testified that she had a meeting with Defendant Spiert and other Graybar employees at the end of January 2000. During that meeting, she specifically advised Defendant Spiert and the others that he must indicate the number of patients and the patients' names in particular on each billing so that it could be prorated. Now, because of that... And who did she represent? Transamerica, which is the company that was... The insurance company. The intermediary for Medicare, yes. So she was responsible for explaining the policies and the practices and paying out on these bills. And she let them know that this information was material to Transamerica and therefore Medicare when they reviewed the bills and paid out. She let them know that they would in fact be paid a lower rate per patient when there were multiple patients in the ambulance. And despite this advisement, Defendant Spiert and the other Graybar defendants continued to act as though they could transport multiple patients at the same time and bill as though they were transported individually. And Defendant Spiert personally submitted all of those bills indicating that they were transported individually. Now, it was often the case that these patients were picked up in slightly different locations and dropped off at the same place. But it was also sometimes the case that they were all picked up at the same location and dropped off at the same location. It varied. You have to go through each of the transportation logs to figure out which was which. But it was a smattering of or a combination of those circumstances. Okay. But why isn't it a constructive variance if in the indictment you allege the grand jury issues the indictment based on a medical regulation which is not in effect and then later on the evidence comes in and it's based on Ms. Matoya advising Mr. Schert of this requirement? First, I would like to point out that Defendant Spiert's counsel has not put one iota of transcript in front of the grand jury before this court. He has asked this court to speculate what happened in front of the grand jury to assume what happened in front of the grand jury. We know what the grand jury issued, right? We have it. Yes, we do, Your Honor. And if we look at the charging language of the indictment, counts 5 through 11 are specifically premised on Title 18 U.S.C. 1347 and Section 2, aiding and abetting. Nowhere in counts 5 through 11 is there any reference to the regulatory violation. And the evidence presented to the grand jury was the conduct that multiple patients were transported and the bills were submitted as though they were individually transported. At this point in time, frankly, I'm not even sure if they were advised as to the law regarding the regulation. One could assume, as Mr. Wray has chosen to, that they were told as a matter of law this regulation existed. As I've pointed out, that is just akin to the Lazaro case where the government has made a misstatement of law in front of the grand jury and that is subject to the harmless error review set forth by the Supreme Court in Menchenik, where they said, well, if the pedigree – excuse me – if the pedigree is given the proper instruction of law and still finds beyond a reasonable doubt that the offense is committed, that renders harmless beyond a reasonable doubt the error in front of the grand jury. So here what we have is that the charge in language makes clear what the violation is. It's a statutory violation. The government's opening makes clear I never once referenced this regulation during my opening. I referenced the offense conduct, which was the multiple transports and the billing of a single patient. But you offered to take it out. We did.  it was inadvertent that, you know, the government hadn't looked at the indictment beforehand and caught the error. But the defense, who had equal access to these federal regulations for years, this indictment was returned, I believe, at least two years before the trial. They didn't attack the indictment before the trial. They raised the issue during the trial. In an effort to remedy whatever prejudice might have been raised, the government offered to strike that language. Instead, all of the defendants refused that offer and they were very, very shrewd to have done so because they made the most of that error. They asked the court to take judicial notice of the 2002 regulation to point out to the jury that the government had made this error because they had alleged it happened. The jury was instructed or told that this was an error? Yes, Your Honor. And to disregard it? No, Your Honor. In fact, I believe the government asked for that kind of instruction and the court said, Well, Your Honor, well, government, this was your error and you're going to have to take a beating for it. And we did. It was Mr. Levine, who was trial counsel for Mr. Spirit, who during his closing argument went to great length to say that Ms. Montoya, who works for Transamerica, was not a congresswoman. She can't make the laws. Therefore, her statement, even if you believe that she put defendant Spirit on notice, his conduct was not a crime as a matter of law because she can't create laws. He was able to use a defense that legally was incorrect because the statutory violation of health care fraud does not require regulatory violation and yet he argued that it did and because there was no regulation in place that the jury should acquit Mr. Spirit on those counts. Now, the jury was not fooled because they received the proper instructions from the court in that the title 18 U.S.C., excuse me, 18 U.S.C. 1347, when you read that jury instruction, did not require regulatory violation and despite the fact that they knew of the government's error, that it was pointed out and really made the most of by the defense, they found these defendants guilty anyway. So it's clear that the error that was definitely made by the government was corrected by the Pettit, excuse me, the Pettit jury's verdict. I'd also like to point out this reference to the Medi-Cal regulation is a red herring for a very simple reason. Medi-Cal is where there are two separate entities. There's Medicare and Medi-Cal and obviously neither one is supposed to be used to regulate the other. But Medi-Cal is issuing regulations for wheelchair vans and you can transport a number of patients, a number of patients in the wheelchair van and the reimbursement rate is significantly lower. I believe it's less than $30 a patient, whereas the ambulance is several hundred dollars a patient. So whereas Medi-Cal may say, sure, you can do this and you don't have to prorate it, we're talking about maybe $30 a patient versus several hundred and they really shouldn't be cross-referenced. There were also, there was also testimony at trial. Defendant Speer testified that he had told someone at Medicare, well, because there's no regulation, I want to use this Medi-Cal regulation and he testified that Ms. Montoya agreed with him and that that made sense. Her testimony on the rebuttal case was that no, in fact, that never happened. She would never tell someone to use Medi-Cal. So this was an issue presented to the jury and it was rejected by the jury. If there are no other questions on that issue, I would like to move on to the issues raised by Defendant Gonzalez. I'm concerned on the sentencing question that we may have to defer that pending Claiborne readout because it seems to me that what, the errors that, you know, you're familiar with Claiborne readout. I'm actually not familiar with those two particular cases. I apologize. Zavala-Cardi? Yes. Okay. Well, we've deferred our ruling on Zavala-Cardi pending the Supreme Court's decision on two cases, Claiborne readout, which raised similar issues. Is that the issue of whether or not presumption should be given to the sentencing? Not just that, but how you actually, there's a number of issues. There was a briefing order in Zavala-Cardi that touches on a number of issues, including that particular one. But it goes to how you conduct reasonableness review. And I think, given, and I just want to know, my feeling is tentatively, given that we're talking about whether declaring convincing standards still applies on evidence and these particular enhancements and the application of the Section 3553 factors that we probably have to defer ruling on that until we see how the Supreme Court's going to tell us how to factor in some of these things. Your Honor, I think that in this particular case we can go forward with the sentencing issue. There is a longstanding case law in the Ninth Circuit that instructs us how we deal with these various issues and when it arises out of a conspiracy and when other sentencing factors ought to be given a heightened analysis for due process reasons. And I think we do have the instruction from the Ninth Circuit case law such that we could go forward today. Because most of the sentencing enhancements here really do relate to the charge of conduct, it's clear that the case law of United States v. Dare and U.S. v. Harrison have survived the Booker-Blakely. And what about United States v. Statton? Well, that, yes, Your Honor. United States v. Statton says that essentially the clear and convincing standard survives the Booker decision. But even before Booker, that was not applied to all sentencing factors. That was reserved for cases where you were really enhancing somebody's sentence based on uncharged conduct. And here we don't have that. We have a single sentencing enhancement that was not related directly to the charges in the case. And that's for obstruction. That was a two-point enhancement. But when we look at all of the other enhancements in this case, we have loss, we have the more than minimal planning, which is a specific offense characteristic. And under Johanneson, we learned that that indicates that it is part of the extent of the conspiracy if it is labeled as a specific intent, excuse me, specific offense characteristic. And then we have his role in the conspiracy, which it logically concludes that his role in the conspiracy for which he was convicted is part and parcel of the charged conduct that the jury found him guilty of. So I don't think we have here a case where due process is offended by the preponderance of the evidence standard. I think we have a case where the jury returned the verdict of guilty on the conspiracy as well as health care fraud, several counts of health care fraud, and the vast majority, all but two enhancements came, excuse me, two levels of enhancement came from that conduct. It's not a case where the enhancements come from uncharged conduct or relevant conduct that cannot be related to the conspiracy. So I think we can go forward. I would also like to address the discovery, allegation of the discovery violation because I do think there's been some misrepresentations as to what happened. I was trial counsel. I know Mr. Newman was not, but it was the case that those, the fact that these documents existed was disclosed to defense counsel and not a single one of them made any attempt to review it pretrial. There was a request that certain documents be specifically produced and the government produced those documents. With respect to what was found after trial, despite Mr. Newman's allegation that there was a hodgepodge of documents spewed everywhere, this simply wasn't the case. There was no finding or even genuine factual showing to the district court that it was anything other than the documents were stored in two locations. And while Mr. Newman has said there are certain binders that weren't found, there wasn't sufficient credible evidence that those binders were ever seized by the government. So the district court made its finding that at the time that the discovery motion was brought pre-sentencing, he was ultimately satisfied that whatever the government had in its possession had been made available to the defense. And what was presented to him didn't, in his mind, amount to something that would change the trial verdict if a new trial were given. Also, he specifically noted that there was no allegation that a Brady violation had occurred pretrial and he wasn't considering that. So it really is untimely for Mr. Newman to raise that on behalf of Mr. Gonzales at this time. I'd also point out that in Defendant Spirit's reply brief he indicated that the issue of bed confined was really limited to a certain number of counts and a certain number of patients and I think the factual record more than supports that that was the overarching issue in the case that Defendant Spirit and Defendant Gonzales and the other managers at Graybore universally told the EMTs that they must indicate bed confined on the patient's trip tickets whether or not those patients were bed confined. So the fact that that evidence came in with so prominent trial was directly relevant to the issues before the jury and it was not irrelevant and that particular argument was not raised in front of the district court so it really is on a plain air review before this court. There were other similarly not similarly the one issue that was raised before the court was whether or not EMTs could testify as a matter of expert opinion that these patients did or did not need ambulance transportation. That was the one issue the district court did rule on and said that no the EMTs could only testify to what they observed not what their  was as a matter of whether or not the patients used the ambulance so this issue really is being raised for the first time in front of the appellate court. And if the court doesn't have any further questions for the court excuse me for the government I would thank you for your time. Thank you Ms. Ryan. I'll give each of you guys a minute and a half for rebuttal. Thank you Your Honor I'll be very brief. First I have a great deal of respect for Ms. Ryan and she attempted to avoid this issue of the constructive amendment very effectively but respectfully I'd like the court to consider it just from this point of view. Imagine a charge here was only a conspiracy to violate the provision regarding multiple transports and you had just a conspiracy with that one object and then the substantive counts five through eleven. Had that been the case that conspiracy would have had to have been dismissed during the course of trial because its object was illegal. Had that been the case at the very least under this circuit's decision United States versus NAKAI 413 Fed 3rd 1019 it would have been legally impermissible to give the Pinkerton instruction and not only would it have been legally impermissible to give the instruction under NAKAI because there would have been no valid conspiracy count it would have been a violation of Barona because the conspiracy count would have been illegal. So however one looks at it we still get back to the fact that those counts are potentially illegally returned. Secondly, counsel has brought up the bed confined issue. I haven't had a chance to address that. I have addressed it in the brief and I've asked the court to review that. But clearly the evidence we are complaining about is evidence that 25 to 75 percent supposedly of these patients were ambulatory. Just because they're ambulatory doesn't mean they can't be transported by ambulance. There are other reasons why they can be transported by ambulance and they never tied any of those allegations to specific claims that these people were billed in that fashion. And finally just very quickly I wasn't trial counsel but I came in as the one who was running around looking at all these boxes. We did ask to join in that portion of the argument. I would just indicate to the court I believe that the record reflects that while the trial counsel did not review the boxes that an investigator for the trial counsel went down and reviewed the boxes that were available but was unaware of the fact that these boxes  not available for investigation. One important factor here I believe that from what I remember because I was at trial myself in that the documents that binders that was in question regarding from Dr. Rondo's office became very important at the time that wasn't disclosed to the defense was because of the fact that it would show the medical necessity forms of each patient that was transported by Dr. Rondo which allowed Grayboard to make that transportation that is one issue that became very important with respect to the discovery issue and documents from Dr. Rondo's office. I want to point out  Dr. Rondo's office was not clear as to exactly what the requirement from the ambulance company was based on Medicare billing. For example there was no testimony which indicated that a ambulance company ambulance transport of the same patient from two patients or three patients from one location to the same location should be treated differently than if the patients were  from    the other location. And that's why the obligation on transferring to different locations can be individually. That's all. Thank you, sir. Mr. Newman. Thank you, Your Honor. Brian Newman for Mr. Gonzales. Your Honor, the disproportionate manner in which the Court viewed the 3553 factors by giving the greatest weight to the seriousness of the offense versus vis-à-vis other remedies, other sentences certainly caused a great deal of concern. It should be considered also the fact that Mr. Gonzales got a sentence about 60 percent of that of Mr. Schpert, who, of course, ran the company. Also, Your Honor, to have Mr. Schpert I'm sorry, Mr. Gonzales designated for three-level enhancements as a leader manager is sort of disingenuous in that Mr. Schpert was the one who ran this company. Mr. Gonzales had no authority to change or alter any of the requirements set forth by Mr. Schpert. The evidence was that Mr. Schpert had meetings with all the EMTs, all the other employees, telling them exactly what they had to do, and that Mr. Gonzales did not have the authority to alter that in any manner, shape, or form. So, based on that, Your Honor, I would submit on my briefs. Thank you, Mr. Newman. Gentlemen, thank you. Ms. Ryan, thank you as well. The case just argued is submitted. We'll stand in recess for the morning.
judges: Silverman, Wardlaw, Bybee